UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Christopher Mark Williams, | ) | C/A No. 5:14-01664-MGL-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). The issues before the court are whether the Commissioner's findings are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be *reversed and remanded for further administrative proceedings*.

I.    Relevant Background

A.    Procedural History

On January 18, 2012, Plaintiff protectively applied for DIB and SSI under Title II and Title XVI of the Act, 42 U.S.C. §§ 401-433. Tr. 194; 201.[1] He alleged a disability onset date of November 4, 2011. *Id.* Plaintiff's application was denied initially and upon reconsideration, Tr.

---

[1] "Tr." is an abbreviation for "Transcript of the Record" made before the Social Security Administration in connection with Plaintiff's claim for DIB and SSI. It is located on this court's docket at ECF No. 12.

103-07; 115-18, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 28. The administrative hearing was held on November 7, 2013, Tr. 28-46, and on December 3, 2013, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act, Tr. 8-18. The Appeals Council denied Plaintiff's request for review. Tr. 1-6. Thus, the ALJ's decision became final and this case is ripe for judicial review pursuant to 42 U.S.C. § 405(g). Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on April 25, 2014. ECF No. 1.

B.      Plaintiff's Background

Plaintiff was born October 1, 1976, and was 37 years old at the time of the administrative hearing. Tr. 32. Plaintiff completed high school and last worked for Boeing, where he painted aircrafts, until he was dismissed in November of 2011. Tr. 33; 40. Plaintiff claimed the illnesses and conditions that limit his ability to work are spinal impairment, depression, anxiety disorder, panic attack disorder, and seizures. Tr. 34-40.

C.      The Administrative Proceedings

1.      Plaintiff's Hearing Testimony

Plaintiff was 37 years old at the time of his hearing on November 7, 2013, and testified that he was five-foot-eleven-inches tall and weighed 170 pounds. Tr. 32-33. Plaintiff testified that he was single and had a driver's license but his mother drove him to the hearing. Tr. 33. Plaintiff testified that he finished high school and can read and write. *Id.* Plaintiff testified that he had not worked since he was dismissed from his job at Boeing in 2011, but corrected himself and noted that he worked as an election worker in the second quarter of 2012. Tr. 33-34.  Plaintiff testified that after he was dismissed from Boeing he collected unemployment until December 2012. Tr. 34. Plaintiff testified that he is basically living on nothing and that his parents are helping him considerably. Tr. 34.

Plaintiff testified that his mental and physical problems are keeping him from working. Tr. 34. Plaintiff maintained that he suffers from depression, anxiety, and a panic attack disorder. Tr. 34. Specifically, Plaintiff testified that:

> It's hard for me to do anything anymore that I used to be interested in. I have very bad panic attacks that seeming [sic] come on for no reason. They were as many as two or three a week. And, it just feels like my heart is racing, my palms start sweating. I cannot breathe.

Tr. 34-35. Plaintiff testified that he had recently been on medication that controlled the panic attacks, and he had not had one that year, however, he previously had several "along with seizures and blackouts." Tr. 35. When asked whether he was experiencing seizures because of Xanax withdrawal, Plaintiff testified, "[t]hat was certainly one of the opinions, but I had two seizures last year when I was not taking Xanax." *Id.*

Plaintiff testified that he is not currently undergoing counseling but sees "one primary care doctor, who's overseeing my health care at this time." *Id.* Plaintiff's primary care physician is with Palmetto Primary Care, and he recommended Plaintiff see a psychiatrist as well as a back doctor and orthopedist. *Id.* Plaintiff testified that he goes to Palmetto Primary Care every two to three months, and costs limit him from going every month. Tr. 38. Specifically, Plaintiff testified that the doctor there is "good about writing [him] 90-day prescriptions." *Id.*

Plaintiff testified that he is not seeing a psychiatrist because he cannot afford one. Tr. 35-36. Plaintiff testified that he had short-term treatment at Community Counseling in Ashtabula County [Ohio] for about three months. Tr. 36. Plaintiff testified that he stopped going there and went to a different facility in Lakeland, Ohio. Tr. 36. Plaintiff testified that he stopped going to the Lakeland facility because he lost his car in an accident and has had "a couple seizures" behind the wheel. *Id.* Though he is taking anti-seizure medication, Plaintiff testified that he has to limit his driving considerably. *Id.* Plaintiff testified that he gets along with people fairly well

but that his depression affects him on a daily basis because he lacks interest in almost all things, including family activities. Tr. 36-37. Additionally, Plaintiff testified:  "I feel sad and lonely a lot of the time. It's very hard for me to even want to get out bed each morning, to be honest with you." Tr. 37.

Plaintiff testified that he has constant low back pain that is a "throbbing, aching pain." Tr. 37. He testified that the pain can vary in severity, and pains will "shoot down my left leg and in to my foot. Most of the time, that's with each step I take." Tr. 37. Plaintiff testified that part of his back condition is congenital—that his father had several back operations, and Plaintiff testified that he inherited his father's back including congenital spinal stenosis, congenital disc disease, and degenerative disc disease. Tr. 40. Specifically, Plaintiff testified that these conditions "cause me quite a bit of discomfort back there. There's bone going on bone. I've also got herniated disc and a partially herniated disc that is contacting the nerve which gives me considerable pain, as I've stated, down my left leg." *Id.* Though Plaintiff agreed that while he had worked for a number of years with the congenital problems that it is becoming worse every year, and it has "become quite a distraction at work." *Id.* Plaintiff testified that the condition has led him to take medication that he probably should not be driving or working while taking. *Id.* Further, Plaintiff testified that:

> [W]hile I was painting at Boeing, I was painting with considerable amounts of weight placed upon me. As far as personal protection equipment, and considerable bending, obviously, to paint an aircraft. And that, in combination with an auto accident, really changed the way my back feels.  And it really stepped it up a notch considerably.

Tr. 40-41. Plaintiff takes Tramadol ER (extended release), a non-narcotic, for pain and Meloxicam, which is an anti-inflammatory. Tr. 37. Additionally, hydrocodone is prescribed to Plaintiff for "real bad back flare ups, which happen from time to time." Tr. 37. Plaintiff testified that he experiences drowsiness, impaired judgment, and impaired concentration as side effects

from his medications. Tr. 38. Additionally, Plaintiff testified that Tramadol will sometimes cause nausea. *Id.* Plaintiff testified that he can sit for about 10 to 15 minutes before he needs to change positions or stand. *Id.* Similarly, Plaintiff testified that he cannot stand for a very long time because the pain radiates down his left leg and "[i]t's quite uncomfortable before I start shifting my weight or needing to sit." *Id.* Further, Plaintiff testified that because of the back pain and pain that goes down his leg, he can walk for only 10 to 15 minutes at a time. Tr. 39.

Plaintiff testified that the doctor at Tidewater Neurology initially forbade Plaintiff from lifting any weight at all and "then as we progressed through treatment, he lifted that, I believe [to] 25 pounds." Tr. 39. Plaintiff testified that Dr. Dawson, his current doctor, limited him to lifting 10 pounds of weight at a given time. *Id.* Plaintiff testified that he does not have any problems using his hands. *Id.* Plaintiff testified that he can dress and shower "okay." Tr. 41. When asked how he spends his day, Plaintiff testified:

> I spend my day mostly trying to get comfortable, whether it's relaxing in the bed, trying to read[,] watch a bit of TV. But I primarily read and just try to get in a comfortable position. It's uncomfortable for me to sit too long and lie down. I go out with my mom when I can and help her run some errands from time to time, but for the most part, I stay home.

Tr. 41. Additionally, Plaintiff explained that he has some anxiety when he leaves the house or "[a] fear of having a panic attack. Fear of being judged by others." Plaintiff admitted to being "computer capable, but not advanced." *Id.*

### 2.     Vocational Expert ("VE") Testimony

John Wilson testified as the VE at Plaintiff's administrative hearing, and described Plaintiff's past relevant work ("PRW") as aircraft painter as skilled with medium strength, a specific vocational preparation ("SVP") of six, and DOT 845.381-014. Tr. 42. The VE indicated that "it's the same DOT for auto painter that he also did." *Id.* Plaintiff's work as assistant service

manager was classified as light, skilled, an SVP of seven, and DOT 620.261-018. Tr. 42-43. The VE indicated that a service advisor has the same DOT number. Tr. 43.

The ALJ asked the VE to consider a person of Plaintiff's age, education, and work experience with a residual functional capacity to perform sedentary work that would not involve crawling or climbing, occasional crouching, kneeling, stooping, no exposure to work hazards, such as unprotected heights or dangerous machinery, limited to simple repetitive tasks, no direct customer service, occasional contact with co-workers and supervisors, and no fast passed [sic] production environment. Tr. 43. The VE agreed that such a person would be precluded from doing the jobs previously cited. *Id.* The VE testified other work was available that the person could perform such as surveillance system monitor, SVP two, unskilled, sedentary, DOT 379.367.010 with 550 jobs in South Carolina and 74,470 jobs in the national economy. *Id.* Additionally, the VE testified that work was available as a dresser, SVP two, unskilled, sedentary, DOT 209.587-010, with 500 jobs in South Carolina and approximately 96,330 in the national economy. *Id.* The VE testified that work was available as a weight tester, SVP two, unskilled, sedentary, DOT 537.485-010, with 8,750 jobs in South Carolina and approximately 434,170 jobs in the national economy. Tr. 44.

The ALJ then asked the VE to consider the first hypothetical with the added limitation that the "worker should be allowed to change position from sit to stand for stretch purposes at least every 15 minutes." Tr. 44. The VE answered that the ALJ's altered hypothetical would not change his answer or the numbers and though the sit/stand option is not in the DOT, "all of them would allow a sit/stand for stretch purpose." *Id.* The VE testified that all jobs would be eliminated if the ALJ added that the hypothetical worker is going to miss at least three days of work per month secondary to symptoms. *Id.*

II.  Discussion

6

A.    The ALJ's Findings

In his December 3, 2013 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since November 4, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he must be allowed to change positions from sitting/standing every 15 minutes. The claimant cannot climb and crawl and he can only occasionally crouch, kneel, and stoop. He must have no exposure to workplace hazards such as unprotected heights of dangerous, moving machinery. The claimant is limited to simple, routine, repetitive tasks in a low stress work environment defined as no fast-paced production work. He can have occasional contact with coworkers and supervisors, but can have no direct customer service duties.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on October 1, 1976 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.964).

8.    The claimant has at least the equivalent of a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a) 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 4, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 8-18.

    B.  Legal Framework

       1.       The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §

whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, §416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b), § 416.920 (a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that

---

404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii), § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526, § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff claims the ALJ erred by: (1) improperly addressing Plaintiff's impairments in combination at Steps Three and Four; (2) improperly rejecting Plaintiff's subjective complaints; and (3) failing to explain his rejection of Dr. Dawson's opinion. Pl.'s Br. 13-22, ECF No. 17. The Commissioner submits that the ALJ committed no reversible error and his decision is supported by substantial evidence. Def.'s Br., ECF No. 19.

1.     Combined Effect of Plaintiff's Impairments

Plaintiff alleges the ALJ did not properly address his impairments in combination at Steps Three and Four. ECF No. 17 at 13. Specifically, Plaintiff argues that the ALJ's determination on the severity of Plaintiff's impairments in combination is not supported by substantial evidence because the ALJ failed to acknowledge an April 5, 2011 MRI. *Id.* at 15. Moreover, Plaintiff argues that "his impairments, in combination, [are] equal in severity to Listing 1.04." *Id.* at 15-16. Further, Plaintiff contends that though the ALJ made accommodations for Plaintiff's mental and other impairments in the RFC assessment, he did not accommodate Plaintiff's impairments in combination. *Id.* at 17. The Commissioner asserts the ALJ considered the combination of Plaintiff's impairments as required by the regulations. ECF No. 19 at 7-9. Furthermore, the Commissioner argues that Plaintiff failed to prove that he was per se disabled and, therefore, the ALJ did not err in finding his impairments did not meet or medically equal Listings 1.04(A) and 12.06(B). *Id.* at 9-12.

a.     Listing 1.04

Plaintiff maintains that he has supplied evidence that demonstrates his condition meets or is equal to Listing 1.04(A), ECF No. 17 at 16, while the Commissioner maintains the ALJ did not err in finding Plaintiff's impairments did not meet or medically equal Listing 1.04(A).

Disorders of the spine under Listing 1.04 can come in the form of:

[H]erniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture[], resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04. In other words, Listing 1.04(A) is met "when the claimant suffers from a spinal disorder such as a herniated nucleus pulposus, spinal stenosis, osteoarthritis, degenerative disc disease or facet arthritis resulting in compromise of the nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomical distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." *Greene v. Colvin*, 999 F. Supp. 2d 845, 847 (E.D.N.C. 2014).

In his Decision, the ALJ found that Plaintiff's "physical impairment does not rise to the level of severity as defined in the Listing of Impairments 1.04, Disorders of the Spine or any Social Security Rulings." Tr. 11. Specifically, the ALJ found that "MRI examinations failed to reveal any significant herniations, stenosis or nerve root impingement." *Id.* Plaintiff argues that contrary to the ALJ's finding, "the April 2011 MRI demonstrated all three." ECF No. 17 at 15. The undersigned finds that the ALJ erred at Step Three in his consideration of whether Plaintiff met the requirements for disorders of the spine under Section 1.04 of the Social Security Administration's Listing of Impairments.

"Herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain and nerve root irritation." *See* http://www.nlm.nih.gov/medlineplus/ency/imagepages/9700.htm (last visited June 30, 2015).

"Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back." *See* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited June 30, 2015). The April 2011 MRI indicates that at L5/S1 Plaintiff has a "small left paracentral disc herniation with increased signal on T2 consistent with annular tear [] noted." Tr. 436.  The medical note indicates that "[t]his contacts and displaces the S1 nerve root in the left lateral recess. This also accentuates the congenial spinal stenosis with a decrease in the AP diameter of the thecal sac to about 7 mm at this level. Mild facet arthropathy and ligamentum flavum hypertrophy are also noted." *Id.* "No more than mild central stenosis" is noted at L3/L4, and "some mild neural foraminal stenosis of the left out laterally" is noted at L4/L5. *Id.* The following two impressions were also noted: "1. Mild congenital lumbar spinal stenosis seen throughout the entire lumbar spine. 2. Superimposed degenerative changes maximal at L5-S1. At this level, a small paracentral disc protrusion produces mass effect on the exiting L5 root on the left." *Id.* On February 21, 2012, Plaintiff was treated by Dr. Paul C. Hanahan. Tr. 429. Dr. Hanahan noted that an "MRI of the lumbar spine notes congenital lumbar spinal stenosis; degenerative changes at L5-S1 with small paracentral disc extrusion producing pressure on the exiting L5 nerve root to the left." Tr. 429. Additionally, a February 23, 2012 medical report indicated that Plaintiff had an "L5-S1 herniated disc." Tr. 382. Under the section labeled Assessments in a June 12, 2012 report, Dr. Timothy Ko of Pinnacle Interventional Pain & Spine Consultants found Plaintiff had a "displaced disc w/o myelopathy-Lumbar-722.10 (Primary)" and "Radicular Synd, Lower Limb (Lumb/Thor)-724.4." Tr. 442. In discussing Plaintiff's treatment options, Dr. Ko found "we will consider a right L4 and L5 lumbar transformational epidural steroid injection based on the nerve root compression caused by disc herniation at L5/S1 on the MRI dated April 2011." *Id.*

Therefore, Plaintiff's medical records, including the April 2011 MRI indicate that Plaintiff suffers from conditions which may meet the requirements for an underlying spine disorder in Listing 1.04. The undersigned will examine whether the medical evidence demonstrates limitations found in subsection A: "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . ."

Dr. Charles Kelly of Tidewater Neurology examined Plaintiff on April 5, 2011, and indicated that Plaintiff came in for low back pain and "spontaneous pain, which [Plaintiff] described as lightening bolts down his left knee into the foot." Tr. 472. Dr. Kelly found that Plaintiff also had "knee stiffness," and film of the lumbar spine "showed spondylolisthesis at L5-S1." *Id.* Plaintiff described pain in the left lower back, "with radiation to the left buttocks [that] increases with walking standing, bending, squatting, and sitting. . . ." *Id.*

On February 21, 2012, Plaintiff was examined by Dr. Hanahan who found tenderness present in Plaintiff's lower midline of back and left paralumbar muscles. Tr. 429. Additionally, notes indicate: "Leg lift is weaker on the left. Toe walking is painful on the left. Deep tendon reflexes are decreased in the left leg at knee and ankle." *Id.* In his assessment, Dr. Hanahan found "Degenerative disc disease of lumbar spine with left leg radiculopathy." *Id.* In a March 20, 2012 examination, Dr. Hanahan again noted back tenderness present in the lower midline and left paralumbar muscles. Tr. 428. Additionally, notes indicate: "There is restricted range of motion to the right. Leg lift is weaker on the left. Deep tendon reflexes decreased in the left knee." *Id.* In his assessment, Dr. Hanahan found "Degenerative disc disease of lumbar spine with left leg radiculopathy." *Id.* In his April examination, Dr. Hanahan found that Plaintiff's "[r]ange

14

of motion of the back [was] restricted at the extremes [but] no motor or sensory deficits [were] noted." Tr. 451. In a May 15, 2012 examination, Dr. Hanahan found the same tenderness present and found that "[r]ange of motion is restricted." Tr. 450. Again, Dr. Hanahan found that "[l]eg lift is weak on the left." In a June 13, 2012 examination, Dr. Hanahan noted the back tenderness present in the lower midline and left paralumbar area. Tr. 449. Again he found that the "[l]eg lift is weaker on the left. Gait is moderately antalgic favoring the left." *Id.* In his assessment, Dr. Hanahan found low back pain with "left leg radiculopathy." *Id.* In his July 2012 evaluation, Dr. Hanahan found that Plaintiff's "[r]ange of motion is restricted. Gait is antalgic. Flexion and extension is painful." Tr. 448.

On June 12, 2012, Patient sought treatment for lumbar pain and was treated by Dr. Ko. Tr. 441. On examination of his lumbar spine and lower back, Dr. Ko indicates: "Patient appears to be in pain in the left lower back and left lower extremity. PALPATION: pain with extension, pain with flexion. RANGE OF MOTION: Limited due to pain, Limited due to stiffness. STRAIGHT LEG RAISING TEST: positive on the left. STABILITY: no overt evidence for instability on exam." Tr. 442. A June 14, 2012 Neurology note indicates that Plaintiff's reflexes were 2/4 in his upper and lower extremities. Tr. 461. Medical notes from Trident Medical providers indicate that Plaintiff was seen on March 16, 2013 for back pain that radiates into his left leg. Tr. 524. The pain was noted as exacerbated with movement. *Id.* An April 15, 2013 medical report from Trident Health Systems indicates "L straight leg raise + at (60)." Tr. 532.

Based on the above evidence of nerve root compression, limitation of motion of the spine, motor loss, sensory and reflex loss and, if there is involvement of the lower back, positive straight-leg raising tests, the undersigned finds that Plaintiff has supplied ample evidence that his impairments may meet or may be equal to Listing 1.04, and the ALJ's finding that Plaintiff's impairment does not rise to the level of severity as defined in the Listing is not supported by

15

substantial evidence. The ALJ found that the record did not demonstrate that the claimant suffers from a disorder of the spine resulting in a compromise of the nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test. Tr. 11. This is clearly contrary to the record as outlined above.

The ALJ found that the "MRI examinations failed to reveal any significant herniations, stenosis or nerve root impingement." *Id.* Later, outside the context of Listing 1.04, the ALJ recognized that medical providers found Plaintiff had "a left-sided herniated disk at L5-S1 with no deficits," and "MRI evidence revealed congenital spinal stenosis and L5 nerve root impingement." Tr. 14. Additionally, the ALJ noted that Plaintiff "was assessed with chronic back pain" and "degenerative disc disease of the lumbar spine with left leg radiculopathy." *Id.* The ALJ noted Dr. Claudius Dawson[3] completed a Medical Source Statement indicating that Plaintiff was able to sit, stand, or walk for only one hour in an 8-hour work day "because of spinal degenerative disc disease, stenosis, [and] a herniated disc at L5-S1 and radiculopathy." Tr. 15.

The ALJ determined in Step Two that Plaintiff had the severe impairment of degenerative disc disease and anxiety disorder. Tr. 10. At Step Three, the ALJ determined that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 11. A thorough reading of the decision exposes the finding as simply an observation of the ALJ for which he provided no support.

---

[3] Medical records from Primary Care Physicians are signed by Claudius Dawson, M.D., Tr. 513-23, however while the signature on the Medical Source Statement is illegible, the first page refers to Dr. Stuart Dawson of Palmetto Primary Care, Tr. 507-11.

Though the ALJ expressly found that Plaintiff's MRI did not reveal herniations, stenosis or nerve root impingement, as noted above, he later recognized that several medical providers found Plaintiff met the underlying spine disorder criteria in Listing 1.04. Therefore, the undersigned finds that the ALJ's decision regarding whether Plaintiff meets the underlying spinal disorder in Listing 1.04 is not supported by substantial evidence. Accordingly, the undersigned recommends reversing the ALJ's determination that Plaintiff's spinal impairment did not meet the underlying spinal disorder in the first portion of Listing 1.04 and remanding this issue for consideration of whether there is evidence of nerve root compression in subsection A of Listing 1.04.

Generally, it is the responsibility of the ALJ to decide the legal question of whether a listing is met by a claimant's impairments. *See* SSR 96–6p. Here, the ALJ did not follow the appropriate procedure for explaining his 1.04 Listing determination. Though he set forth the criteria for meeting the Listing, he did not compare the listed criteria with Plaintiff's symptoms, and other than an incorrect reference to MRI examinations he did not state explicitly his reasons for finding that Plaintiff's impairments did not meet a listed impairment. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Therefore, the undersigned finds that the ALJ's decision regarding whether Plaintiff meets Listing 1.04 is not supported by substantial evidence, and recommends remand on this issue.

b.      Combined Effect

Plaintiff maintains that his impairments, in combination, were equal in severity to a listing.

ECF No. 17 at 15. Specifically, Plaintiff argues that the ALJ "failed to explain why the findings related to Listing 12.06 were not of 'equal significance' to any missing findings under Listing 1.04." ECF No. 17 at 16. The Commissioner maintains the ALJ's decision is supported by substantial evidence and should be affirmed. ECF No. 19 at 9.

17

When a plaintiff has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989); *Lemacks v. Astrue*, No. 8:07–2438–RBH–BHH, 2008 WL 2510087, \*3 (D.S.C. May 29, 2008). Even if the Plaintiff's impairment or impairments in and of themselves are not "listed impairments" that are considered disabling per se, the Commissioner must also "consider the *combined effect* of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004) (emphasis added). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50.

"As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

Here, the ALJ found that Plaintiff's severe impairments include degenerative disc disease and anxiety disorder. Tr. 10. The ALJ also found that "[t]he severity of [Plaintiff's] mental impairments, considered singly or in combination, do not meet or medically equal the criteria of listing 12.04." Tr. 11. After evaluating Plaintiff's severe and non-severe impairments, the ALJ found Plaintiff's impairments "are not at least equal in severity to those described in Listings, 1.04, 11.00, and 12.06." Tr. 12. The ALJ noted that he specifically considered the cumulative effects of the impairments on the claimant's ability to work, and noted that Plaintiff's impairments cause him exertional, postural, environmental, and mental limitations. *Id.* However, the ALJ determined that Plaintiff's impairments are not, in combination, equal to any Listing. *Id.*

In his consideration of Listing 12.04 the ALJ determined that Plaintiff's mental impairments do not meet the criteria in paragraphs B or C of Listing 12.04. Tr. 11-12.  In his

analysis, the ALJ compared the listed criteria with Plaintiff's symptoms and explicitly stated his reasons for finding that Plaintiff's mental impairments did not meet the criteria of Listing 12.04. Specifically, the ALJ found that plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration" to satisfy paragraph B and that "the evidence fails to establish the presence of 'paragraph C' criteria." Tr. 12. *See Cook v. Heckler*, 783 F.2d at 1173. Therefore, the undersigned finds that the ALJ properly analyzed whether Plaintiff meets Listing 12.04. However, because the undersigned recommends remand for further consideration of Listing 1.04, the ALJ will need to revisit whether Plaintiff's physical impairment in combination with his mental impairments meet or equal the severity of a Listing.

2.     Plaintiff's Credibility

Plaintiff maintains that the ALJ improperly rejected his subjective complaints. ECF No. 17 at 17-20. The Commissioner maintains that the ALJ followed the controlling regulations in evaluating the credibility of Plaintiff's subjective complaints. ECF No. 19 at 12-18.

The Social Security Regulations provide a two-step process for evaluating "symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness." SSR 96-7p. An adjudicator is first required to consider whether there is an underlying medically determinable physical impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the individual's pain or other symptoms. *Id.* Additionally, once prong one is met, an adjudicator is required to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Id.*

In considering the first prong, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. . . ." Tr. 13. However, in evaluating prong two, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* The ALJ reasoned that Plaintiff's "acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim for disability." Tr. 14. Additionally, the ALJ noted results from Plaintiff's physical examinations and found that, although recommended, Plaintiff was not undergoing mental health counseling. *Id.* After reviewing Plaintiff's medical history, the ALJ determined that "there are no medical findings of sufficient severity to suggest that [Plaintiff] is completely incapable of all work activity." Tr. 16. Further, the ALJ found that treatment notes indicate that Plaintiff's pain symptoms are "generally controlled with medications, [while] gait, station, and muscle tone in the lower extremities are normal." *Id.*

Here, the ALJ properly evaluated Plaintiff's symptoms in accordance with SSR 96-7p. Though the ALJ determined that objective medical findings indicate that Plaintiff's symptoms exist, the ALJ nevertheless determined that the intensity of the symptoms were less severe than Plaintiff alleged. Such a finding is not inconsistent with the mandates of the regulations. *See Craig v. Chater*, 76 F.3d 585, 591 (4th Cir. 1996) ("[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant."); *see also Smith v. Astrue*, 457 F. App'x 326, 329 (4th Cir. 2011) ("*Craig* does not create or recognize a great weight rule affording the claimant a presumption of credibility at step two of the pain analysis based on a successful showing at step one."). Accordingly, the undersigned recommends affirming the ALJ's credibility finding. However, to the extent the

ALJ's reconsideration of his Listing analysis impacts his credibility assessment, the ALJ should also revisit this analysis upon remand.

### 3.     Treating Physician Opinions

Plaintiff asserts that the "ALJ failed to explain his rejection of Dr. Dawson's opinion." ECF No. 17 at 20-22. Further, Plaintiff contends that the weight given to Dr. Dawson's opinion was not supported by substantial evidence. *Id.* The Commissioner maintains that the ALJ followed the controlling regulations in evaluating the opinion evidence because the decision "need only be specific enough to allow a reviewing court to determine the weight given to the opinion and the reasons for that weight." ECF No. 19 at 18-20.

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d at 590 (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the

opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. §§ 404.1527(c), 416.927(c). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (citing *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 178. Social Security Ruling 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence.

In a Medical Source Statement dated October 30, 2013, Dr. Dawson found that Plaintiff had the following limitations because of spinal degenerative disc disease, stenosis, a herniated disc at L5-S1, and radiculopathy:  Plaintiff could sit, stand, or walk for one hour in an eight hour work day; Plaintiff could occasionally lift/carry 20 pounds or less and could never lift/carry more than 21 pounds, Plaintiff could sit for 15 minutes before changing positions, Plaintiff could stand for 10-15 minutes before changing positions, Plaintiff cannot push or pull with either upper extremity, Plaintiff could not perform any postural movements other than rarely bending or occasionally reaching overhead. Tr. 507-09. Additionally, Dr. Dawson determined that Plaintiff was likely to be absent from work three or more times each month. Tr. 509. Additionally, Dr. Dawson found that Plaintiff had difficulty dealing with moderate levels of stress and that his prescribed medications caused drowsiness and impaired concentration. Tr. 510.

22

Here, the ALJ reviewed the Medical Source Statement completed by Dr. Dawson, Tr. 15, but "accorded little weight to the opinion of Dr. Dawson in Exhibit 12F." Tr. 16. Specifically, the ALJ reasoned:

> While it is reasonable to think that [Plaintiff's] treating physician would like [Plaintiff] to have greater treatment options, his very extensive physical limitations are not consistent with his own treatment notes or other medical evidence in the record. During multiple examinations, Dr. Dawson and treating physicians in the emergency room have failed to reveal any significant motor or neurological deficits in the lower extremities. [Plaintiff's] gait was consistently described as normal.

Tr. 16. The ALJ considered and gave "great weight" to the opinions of two non-treating physicians, Dr. Haskins and Dr. Pylaeva. Tr. 16 (citing Ex. 6A). In a Mental Residual Functional Capacity ("RFC") Assessment dated August 28, 2012, Dr. Haskins opined that Plaintiff was capable of simple tasks and should have only occasional social contact, Tr. 96-98, while in an August 23, 2012 Physical RFC Assessment Dr. Pylaeva opined that Plaintiff was capable of light exertional work with standing/walking four hours in an eight-hour day and six hours of sitting in an eight-hour day, Tr. 94-96. Although these opinions provide contrary evidence to the opinions of Plaintiff's treating physicians, because the undersigned finds the ALJ did not assess Plaintiff's physical impairments properly at Step Three the undersigned is unable to determine if the ALJ's opinion is supported by substantial evidence. Accordingly, on remand the ALJ should reconsider the weight attributed to Dr. Dawson's opinion.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has shown that substantial evidence does not support the ALJ's decision regarding Plaintiff's failure to meet the underlying spinal disorder criteria in Listing 1.04. Therefore, the undersigned recommends remanding this issue for consideration of

whether there is evidence of nerve root compression as described in subsection A of Listing 1.04.

On remand the ALJ should also consider Plaintiff's remaining allegations of error as set forth

above.

IT IS SO RECOMMENDED.


June 30, 2015                                          Kaymani D. West
Florence, South Carolina                              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**